**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MYISHA STAPLES,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **CITY OF PHILADELPHIA,** | **NO.  22-2118** |
| **OFFICER GEORGE CHERIYAN and** | |
| **AMIR FEREBEE,** | |
| **Defendants.** | |

<u>**MEMORANDUM**</u>

**HODGE, J.**                                                                                              **July 10, 2023**

Plaintiff Myisha Staples brought this action under 42 U.S.C. § 1983 and Pennsylvania state law against Defendants City of Philadelphia, Officer George Cheriyan, and Amir Ferebee[1] for injuries she sustained when a then-inmate at the Curran-Fromhold Correctional Facility ("CFCF"), Amir Ferebee, assaulted Plaintiff as she attempted to check his temperature pursuant to a prison Covid-19 policy.  Plaintiff claims that Defendants Cheriyan and the City of Philadelphia failed to protect her from Defendant Ferebee's assault, and in doing so, they are liable for the alleged conduct, under the Pennsylvania Constitution, and for a "state-created danger" that violated Plaintiff's due process rights under the Fourteenth Amendment.  (ECF No. 31-1 at 8.)  Now before this Court is the Motion for Summary Judgment of Defendants City of

---

[1] Though Plaintiff initially brought this action against additional defendants, City of Philadelphia Curran-Fromhold Correctional Facility, Philadelphia Department of Prisons House of Corrections, Board of Trustees of Philadelphia Prisons, Deputy Warden Edwin Cruz, Deputy Warden Robert Rose, and Commissioner Blanche-Carney, they were dismissed by stipulation on February 6, 2023.  (ECF No. 26.)  On August 16, 2022, the Clerk of Court entered default against Defendant Amir Ferebee for failure to respond to Plaintiff's Complaint, although default judgment has yet to be obtained against this Defendant.  (ECF No. 16.)

Philadelphia and Officer Cheriyan (collectively, "Defendants").  For the reasons set forth below,

the Court grants Defendants' Motion.

## I.    BACKGROUND[2]

On or around May 23, 2020, Plaintiff, a certified medical assistant, was physically

assaulted by Defendant Ferebee after his cell-door at CFCF was opened by Defendant Cheriyan

so Plaintiff could check Defendant Ferebee's temperature pursuant to a Philadelphia Department

of Prisons ("PDP") Covid-19 policy.  (ECF. No. 4-3 at 10; ECF No. 28-1 at 9.)  At the time of

the incident, Plaintiff was employed by Corizon Health, Inc., a vendor that had contracted with

the PDP to provide health care to inmates including at CFCF.  (ECF No. 28-1 at 4.)  Plaintiff had

been an employee of Corizon for eleven years.  (*Id.* at 7.)  During her employment, Plaintiff

worked at different PDP facilities, though the primary prison she worked at was CFCF.  (*Id.*)

In May of 2020, which was "the peak" of the Covid-19 pandemic, PDP's policy, pursuant

to CDC guidelines, was to quarantine all new inmates for a period of fourteen (14) days before

they entered the general prison population.  (*Id.* at 3.)  PDP's policy also required that inmates be

monitored for symptoms three times a day, which included temperature checks.  (*Id.*)  CFCF,

which is in Philadelphia County and subject to PDP policies, quarantined new male inmates in

the B-Building, where Defendant Ferebee, on the day of the incident, was being held in cell 17.

(*Id.* at 9.)  Inmate temperatures in the B-Building were taken at the inmate's cell, as opposed to a

designated medical area, because of the concern of Covid-19 infection spread.  (*Id.* at 4.)

Medical staff visiting inmates' cells was not a new prison policy.  (*Id.* at 5-6.)  Defendant

Cheriyan testified that in the past, nurses were escorted to individual cells for "special medical

---

[2]   The Court adopts the pagination supplied by the CM/ECF docketing system.

situations" and PDP drug withdrawal protocol often required nurses to see patients by officers opening prison cell-doors. (*Id.*)

Plaintiff was familiar with interacting with inmates at their prison cell-doors, as prior to the incident, she had performed hundreds of Covid-19 temperature checks, including in the B-Building. (*Id.* at 8.) She testified that if she was unprepared for any reason, she could tell the correctional officer who was accompanying her, not to open the inmate's cell-door. (ECF No. 28-4 at 16.) On May 23, 2020, Plaintiff was accompanied by correctional officer Defendant Cheriyan as she performed Covid-19 temperature checks on an estimated forty (40) inmates for a total of forty-five (45) minutes before she went to take Defendant Ferebee's temperature. (*Id.* at 8-9.) Plaintiff initially described the incident as follows: "We got to cell 17, the last cell. Cheriyan opened the door. I didn't even get to ask the name. The guy ran to me and started punching me." (ECF No. 28-4 at 17.) According to security footage of the incident, an officer, who Plaintiff testified was Defendant Cheriyan, opened an inmate's cell-door. (Video, Exhibit H to ECF No. 28; ECF No. 28-4 at 15.) Before the door is pulled open, the inmate can be seen standing behind the cell-door through a small window. (*Id.*) Once the door is opened by Defendant Cheriyan, an individual – who Plaintiff testifies is herself – stands directly in front of the opening to the doorframe. (*Id.*) As soon as Defendant Cheriyan opens the door, the inmate exits the cell and assaults Plaintiff. (*Id.*) Before opening this cell-door, Defendant Cheriyan along with Plaintiff are seen on this video where another inmate's cell-door is opened in the same manner, without incident. (*Id.*) In fact, per Plaintiff's testimony, she had already visited an estimated forty (40) cells that day with Defendant Cheriyan opening each inmate's cell-door using the same process. (ECF No. 28-4 at 8-9, 16.)

Plaintiff stated that Defendant Cheriyan opened doors standing behind them so that Plaintiff would stand "face first" with the inmate.  (*Id.* at 16-17.)  However, Plaintiff testified that at no time prior to the incident did she feel unsafe or tell Defendant Cheriyan to change the way he was opening cell-doors.  (*Id.* at 17.)  Plaintiff also testified that where she stood when the cell-door was opened by the correctional officer was "something I decide."  (*Id.*)  Deputy Commissioner Beaufort testified, after reviewing the surveillance video of the assault, that when Defendant Cheriyan opened Defendant Ferebee's cell-door, Defendant Cheriyan was "out of position" as he did not maintain a "reactionary gap" which "caused little to no reaction time on [Defendant Cheriyan's] part."  (ECF No. 28-1 at 10; ECF No. 28-8 at 14, 18.)  Nonetheless, he opined that Plaintiff "was going to have to get to the incarcerated person …to take the temperature check.  So the officer…in that particular situation he can't be in between the incarcerated individual and [Plaintiff]," but agreed Defendant Cheriyan could have positioned himself better.  (*Id.*)  Defendant Cheriyan received discipline in the form of a "write-up" due to his conduct during this incident for "fail[ing] to take proper action to stop inmate Ferebee."  (*Id.*)

Plaintiff was unaware of any medical assistant either before or after the incident who had been assaulted during a Covid-19 temperature check, and according to the record, this was the first time Defendant Cheriyan witnessed an inmate assault a nurse or other civilian he was escorting.  (*Id.*)  According to a report titled "Philadelphia Prison System Misconduct Reports" for Defendant Ferebee, a day before the incident with Plaintiff, "Officer L.Stone . . . observed inmates fighting inside of cell #10" but there is no indication in the record what the inmates were fighting over. (ECF No. 31-2 at 124.)  Nor is there any evidence that Defendant Ferebee was disciplined or that notification was provided to Defendant Cheriyan as a result.  (*Id.*)  Indeed, this document states that the "finding" for this alleged altercation was "dismissed."  (*Id.*)  There is

4

also no evidence in the record that Defendant Ferebee had ever assaulted a staff member before

that date or per representation of Defendants' counsel, that Defendant Ferebee had ever been

arrested for a violent crime to which Plaintiff has not disputed or presented anything to the

contrary.  (ECF No. 33 at 4.)

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it could affect the

outcome of the suit, given the applicable substantive law, and a dispute is genuine if the evidence

presented is such that a reasonable jury could return a verdict for the non-moving party.

*Anderson v. Liberty Lobby*, *Inc.,* 477 U.S. 242, 248 (1986).  In evaluating a summary judgment

motion, a court "must view the facts in the light most favorable to the non-moving party," and

make every reasonable inference in that party's favor.  *Hugh v. Butler Cty. Family YMCA*, 418

F.3d 265, 267 (3d Cir. 2005).  Nevertheless, the party opposing summary judgment must support

each essential element of the opposition with concrete evidence in the record.  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322-23 (1986).  If the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249-50 (internal citations

omitted).  This requirement upholds the "underlying purpose of summary judgment [which] is to

avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."

*Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v.*

*Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).  Therefore, if after making all

reasonable inferences in favor of the non-moving party, the court determines there is no genuine

dispute as to any material fact, then summary judgment is appropriate. *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

## III.   DISCUSSION

### 1.   State-Created Danger – 42 U.S.C. § 1983

Plaintiff's Section 1983 theory of liability is that Defendants, the City of Philadelphia and Officer Cheriyan, increased her risk of harm through the implementation of the PDP's Covid-19 policies and procedures which resulted in her being assaulted by inmate, Defendant Ferebee. State actors generally do not have an affirmative duty to act to protect citizens from privately inflicted harms. *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 195-96 (1989). However, the state-created danger doctrine operates as an exception to the general rule that state actors have no affirmative duty to protect a citizen who is not in state custody. *Id.* It imposes constitutional liability "when the state acts in a way that makes a person substantially more vulnerable to injury from another source than he or she would have been in the absence of the state intervention." *Schieber v. City of Philadelphia*, 320 F. 3d 409, 416-21 (3d Cir. 2003).

In order to prevail on a state-created danger claim, a plaintiff must prove: (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the [harm] to occur. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995). A plaintiff must show more than merely a failure to create or maintain a safe work environment; rather, a plaintiff must show that the state engaged in "affirmative conduct" that placed him or her in danger. *D.R. by L.R. v. Middle Bucks Area Vo. Tech. Sch.*, 972 F.2d 1364, 1374 (3d Cir. 1992) ("Liability under the state-created danger theory is predicated upon the

6

states' affirmative acts which work to the plaintiffs' detriments in terms of exposure to danger.")
(en banc); *see also Brown v. Grabowski*, 922 F.2d 1097, 1100-01 (3d Cir. 1990) (explaining
"that a state's failure to take affirmative action to protect a victim from the actions of a third
party will not, in the absence of a custodial relationship . . . support a civil rights claim").

The "affirmative conduct" requirement has several components.  A plaintiff must show
not only that the defendant acted "affirmatively," but also that the affirmative conduct placed
him or her in a "worse position than that in which he would have been had [the state] not acted at
all." *DeShaney*, 489 U.S. at 201.  To this end, the United States Court of Appeals for the Third
Circuit has reasoned that "[t]here must be a direct causal relationship between the affirmative act
of the state and plaintiff's harm.  Only then will the affirmative act render the plaintiff 'more
vulnerable to danger than had the state not acted at all.'" *Kaucher v. County of Bucks*, 455 F.3d
418, 432 (3d Cir. 2006).  The alleged affirmative act must be a "but for cause" of the injury
which directly places the victim in harm's way. *Id*.  Further, the state actor must have "acted
with a degree of culpability that shocks the conscience" unless the state actor has time to make
unhurried judgments in which case the level of culpability required is "deliberate indifference" to
a known and obvious danger. *See Schieber v. City of Philadelphia*, 320 F. 3d 409, 416-21 (3d
Cir. 2003); *Sanford v. Stiles*, 456 F.3d 298, 309 (3d Cir. 2006); *see also Bright v. Westmoreland
County*, 443 F.3d 276, 281 (3d Cir. 2006).  Where "there are circumstances involving something
less urgent than a 'split-second' decision but more urgent than an 'unhurried judgment'. . .
defendants [must] disregard a great risk of serious harm." *Sanford*, 456 F.3d at 309-310.

First, the Court finds that there is no genuine issue of material fact as to Plaintiff's state-
created danger claim, as even after making all reasonable inferences in Plaintiff's favor, she fails
to show that Defendants Cheriyan and the City of Philadelphia were the "but for" cause of her

injuries.  The state-created danger doctrine does not render the state liable when the plaintiff's voluntary actions "precipitated or were the catalyst for" the harm suffered and not the state's affirmative conduct.  *Henry v. City of Erie*, 728 F.3d 275, 285 (3d Cir. 2013) (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 (3d Cir. 1997)); *see also Crawford v. Beard*, Civ. No. 4-0777, 2005 U.S. Dist. LEXIS 887, at * 8 (E.D. Pa. 2005), aff'd, 173 F. App'x 17 (3d Cir. 2006) (noting that the Plaintiff "created the dire situation and not the Defendants").  The United States District Court for the Eastern District of Pennsylvania's decision in *Crawford v. Beard* is directly on point to the issues presented in this case.  In that case, the court held, on the defendants' motion for summary judgment, that a prison officer's failure to handcuff an inmate, even if negligent, did not support a state-created danger substantive due process claim filed by a prison nurse who was attacked by the inmate.  2005 U.S. Dist. LEXIS 887, at * 8.  The court reasoned that: "Defendants did not in any way place Plaintiff in a dangerous position.  Plaintiff entered the cell voluntarily" noting that the prison was an "inherently dangerous place."  *Id.*

Here, similar to *Crawford v. Beard*, a juror could not reasonably conclude that Defendants Cheriyan and the City of Philadelphia engaged in affirmative acts that were the "but for cause" of Plaintiff's injuries.  Even when viewing the facts most favorable to Plaintiff that Defendant Cheriyan was "out of position" when he opened Defendant Ferebee's cell door, as Plaintiff admits, where she stood when the cell door was opened by the correctional officer was "something I decide."  (ECF No. 28-4 at 16-17; ECF No. 28-1 at 10.)  Medical staff visiting inmates' cells to perform medical services integral to their jobs was not a new policy, nor was it new to Plaintiff who had done so on hundreds of occasions, including in the very building she was injured.  (ECF No. 28-1 at 8.)  In fact, per Plaintiff's testimony, she had not only visited inmates' cells on hundreds of prior occasions but had done so accompanied by Defendant

Cheriyan for an estimated forty (40) cells the very day she was assaulted, with no previous

incident. (*Id.*) The PDP's Covid-19 policy dictated that Plaintiff perform temperature checks by

visiting inmates' cells; it did not require her to stand face-first in a cell doorframe as it was

opened in an inherently dangerous prison. (Exhibit H to ECF No. 28.) Defendants Cheriyan and

the City of Philadelphia cannot be said to have affirmatively required Plaintiff to stand in this

position, because as Plaintiff states, this was her choice and she remained free to wait until

Defendant Cheriyan approached inmate Ferebee's cell-door or ask that he change his position as

he was opening doors. (ECF No. 28-4 at 16-17.)

      If there was danger, the opportunity for harm was caused by Plaintiff's assumption of the

risk, not Defendant Cheriyan or City policy. *See, e.g. Gregory v. City of Rogers*, 974 F.2d 1006

(8th Cir. 1992), cert. denied, 507 U.S. 913 (1993) (finding driver's act of leaving a key in a car

parked in a police lot with intoxicated passengers was a risk created by the driver, not the police,

and was the catalyst for the injury which plaintiffs suffered); *Mitchell v. Duval County Sch. Bd*.,

107 F.3d 837, 839 (11th Cir. 1997) (holding no state-created danger because the defendant did

not require the decedent to "wait where he did" when shot by a private party, and that he could

have waited inside the building, rather than the distance that he choose); *Morse v. Lower Merion

Sch. Dist.*, 132 F.3d 902, 915-16 (3d. Cir. 1997) (holding that "there was no direct casual

connection between acts or omissions of the state and the harm which befell the victim" because

the state merely "increased the risk" that the victim would be vulnerable to the type of injury

suffered.); *see also Brown v. Newell*, Civ. No. 18-377, 2019 U.S. Dist. LEXIS 151947, at * 7

(W.D. Pa. Sept. 6, 2019) (holding that "[p]laintiff's close interaction with potentially violent

inmates was a foreseeable aspect of her job" and rejecting contention that defendants failed to

"assume a more proactive posture so as to better anticipate and prevent [the inmate's]

unprovoked attacks"); *Crawford,* 2005 U.S. Dist. LEXIS 887, at * 8.  Similar to these cases, no reasonable juror could conclude that Defendants Cheriyan and the City of Philadelphia were the "but for" cause of the harm for which Plaintiff brings suit; rather, it was Plaintiff's own knowing and voluntary choice to place herself in the position that she did to meet and attempt to take the temperature of Defendant Ferebee that resulted in the injury that befell her.

Second, Plaintiff fails to set forth sufficient evidence that the conduct of Defendants "shocks the conscience," shows a disregard of "a great risk of serious harm" or rose to the minimum level of "deliberate indifference."  *Sanford*, 456 F.3d at 309-10.  The Third Circuit has defined "deliberate indifference" as a "conscious disregard of a substantial risk of serious harm." *Kedra v. Schroeter*, 876 F.3d 424, 437 (3d Cir. 2017).  Deliberate indifference requires a level of culpability "fall[ing] somewhere between intent, which 'includes proceeding with knowledge that the harm is substantially certain to occur' and negligence, which involves 'the mere unreasonable risk of harm to another.'"  *Id.*  Knowledge of the "risk of serious harm" is required to show deliberate indifference.  *See Kaucher*, 455 F.3d at 428-29 (holding that plaintiffs' claim failed because they presented no evidence that prison officials were on notice that the steps they had taken to stem a MRSA outbreak were inadequate).  In contrast, "shocks the conscience" is a very high standard that requires state action to be "ill-conceived or malicious." *Schieber v. City of Philadelphia,* 320 F.3d 409, 419 (3d Cir. 2003); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

The Court need not decide which standard applies to the facts of this case, because Plaintiff has failed to demonstrate sufficient evidence to show that even the minimum "deliberate indifference" standard is met.  Plaintiff argues that because Defendant Ferebee was observed in an altercation with his cellmate the day before the incident, he was a known danger to staff.  This

10

altercation could have been for any number of reasons including Defendant Ferebee defending himself.  Yet, despite the completion of discovery, Plaintiff has offered no evidence that Defendant Ferebee was the aggressor in this fight or had ever assaulted a staff member or another inmate while in prison custody.  There is also no evidence that another nurse or any other person within CFCF was assaulted by Defendant Ferebee or any other inmate as a result of the prison's Covid-19 temperature check policy.  In sum, this case is about an officer who opened a cell-door while allegedly standing "out of position" so a nurse, who decided where to stand, could conduct a Covid-19 temperature check, where there is simply no evidence, that on this unfortunate occasion, an inmate would assault her.  This is not the type of "brutal and offensive" behavior that violates the "decencies of civilized conduct" such that it would shock the conscience.  *See Lewis*, 523 U.S. at 846.

Nor do the alleged actions meet the "deliberate indifference" standard.  Plaintiff only cites one distinguishable case to support why the conduct at issue meets this degree of culpability for a state-created danger claim.  *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 246 (3d Cir. 2016).  In that case, the Third Circuit found that "the risk of harm in releasing a five-year-old child to an unidentified, unverified adult is 'so obvious' as to rise to the level of deliberate indifference."  *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d at 246.  A teacher releasing a child into the care of a stranger bears no resemblance to the facts of this case, where in this instance, there is an adult who had the authority and capability to decide where to stand, and that adult knowingly and voluntarily made that choice.

Plaintiff's argument that Defendant Cheriyan should have placed himself in a better position, is at most, negligence, which cannot support a state-created danger claim.  *See Lewis v. County of Sacramento*, 523 U.S. 833, 848-49 (1998) (noting that the Fourteenth Amendment is

not "a font of tort law to be superimposed upon whatever systems may already be administered

by the States"); *Hoover v. Beard*, 248 F. App'x 393, 396 (3d Cir. 2007) (holding defendant's

actions did not shock the conscience when they assigned plaintiff nurse to a shift with the

assaulting inmate, who she had previously reported as threatening her); *Schieber*, 320 F.3d at

417-18 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of

constitutional due process[.]"); *Crawford*, 2005 U.S. Dist. LEXIS 887, at * 4 (finding that even

though correctional officers could have taken steps to have prevented the inmates attack on a

nurse, their conduct at worst was negligent which falls short of the shock the conscience

standard).  To the extent that Plaintiff characterizes Defendants' conduct using the legal terms of

art at issue in this case, including allegations of willfulness, conscience-shocking and deliberate

indifference, the Court does not credit such unsupported legal conclusions.  *See Celotex,* 477

U.S. at 322-23 (1986) (holding bald assertions and mere disagreement that a genuine issue of

material fact exists is insufficient, as the party opposing summary judgment must support each

essential element of the opposition with concrete evidence); *Betts v. New Castle Youth Dev. Ctr.*,

621 F.3d 249, 252 (3d Cir. 2010) (noting that the court need not credit "[u]nsupported assertions,

conclusory allegations, or mere suspicions.").  Because no reasonable juror could conclude that

Plaintiff has a claim for relief under the state-created danger doctrine, the Court finds that

dismissal of Plaintiff's Section 1983 claim against the Defendants is appropriate.

### 2.  Qualified Immunity from Plaintiff's Section 1983 Claim

Plaintiff misconstrues the standard for determining whether Defendant Cheriyan is

entitled to qualified immunity for purposes of her Section 1983 claim as being controlled by the

standards set forth in the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa.C.S.

§§8541-8564.  (ECF No. 31-1 at 22-23.)  Federal law, not Pennsylvania's statute for immunity

from state law claims, controls whether Defendant Cheriyan is entitled to a qualified immunity defense.  And the federal qualified immunity doctrine shields Defendant Cheriyan from a Section 1983 suit unless Plaintiff's due process right was "clearly established at the time of the violation."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity comprises two components.  First, the court must determine whether Plaintiff's allegations show a violation of a federal right.  *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016).  Because Plaintiff fails to make out a constitutional violation under the state-created danger doctrine, Defendant Cheriyan is entitled to qualified immunity on this ground alone.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Second, even if Plaintiff could establish a constitutional violation, Defendant Cheriyan would also be entitled to qualified immunity if such a constitutional violation is not clearly established under existing law.  *L.R. v. Sch. Dist. of Phila.*, 836 F.3d at 241.  Under the qualified immunity doctrine, "clearly established rights" are those with contours sufficiently clear that "a reasonable official would understand that what he is doing violates that right."  *McKee v. Hart*, 436 F.3d 165, 171 (3d Cir. 2006) (citing *McLaughlin v. Watson*, 271 F.3d 566, 571 (3d Cir. 2001)).  "Put another way, 'there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited.'"  *Id.* (citing *McLaughlin*, 271 F.3d at 572).  Plaintiff fails to point to any factually similar cases that would put Defendant Cheriyan on notice that his conduct was constitutionally prohibited.  Indeed, the case law shows the opposite.  *Crawford*, 2005 U.S. Dist. LEXIS 887, at * 4 (finding that correctional officers who could have taken more steps to prevent an inmate from attacking a nurse did not amount to a constitutional violation); *Hoover*, 248 F. App'x at 396 (holding defendant's actions did not amount to a constitutional violation when plaintiff nurse was

assigned to a shift with the assaulting inmate, who she had previously reported as threatening her).  The Court, therefore, concludes that Defendant Cheriyan is also entitled to qualified immunity.

### 3. *Monell* Liability

Plaintiff's *Monell* claim also fails as a matter of law.  The liability of a municipality under 42 U.S.C. § 1983 is governed by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Plaintiff premises *Monell* liability on a "failure to train" theory, alleging that the "City of Philadelphia had no formal training at all with regards to escorting individuals like the Plaintiff around the prison."  (ECF No. 31-1 at 28.)  A municipality may be liable under Section 1983 for failing to train its employees "when the failure to train demonstrates deliberate indifference to the constitutional rights of those whom the [employees] may come into contact[.]" *Gilles v. Davis*, 427 F. 3d 197, 207 n. 7 (3d Cir. 2005).  A municipality will only be liable for inadequate training if, "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *City of Canton v. Harris*, 489 U.S. 378, 387 (1989).  A lack of adequate training is demonstrated by "a pattern of tortious conduct . . . rather than [by] one-time negligent administration of the program or factors peculiar to the officer involved in the particular incident."  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407-408 (1997).

However, since the Court has already determined that Plaintiff has failed to set forth a state-created danger claim, the Court need not address the adequacy of the City of Philadelphia's training as Plaintiff's *Monell* claim cannot be sent to the jury for resolution without a predicate constitutional violation.  *See Monell*, 436 U.S. at 691-92; *Brown v. Pa. Dep't of Health*

*Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003) (finding that "for there to be municipal liability, there still must be a violation of plaintiff's constitutional rights."). Therefore, Defendants are entitled to summary judgment on Plaintiff's *Monell* claim.

### 4. Pennsylvania State Law Claims – Governmental and Official Immunity Pursuant to the Pennsylvania's Political Subdivision Tort Claims Act

Plaintiff brings Pennsylvania state law claims for "negligence – premise liability" Count II, "negligent security" Count III, "Gross Negligence and Recklessness" Count III (sic), "aiding and abetting – Restatement of (Second) Torts § 876" Count VII, "Negligent Hiring, Training, Supervision and Retention" Count VIII, and "Negligent Infliction of Emotional Distress" Count IX against Defendants, the City of Philadelphia and Officer Cheriyan.  The Court finds that these claims are barred by Pennsylvania's Political Subdivision Tort Claims Act, ("Tort Claims Act").

With certain specified exceptions, the Tort Claims Act immunizes a "local agency" from liability for "any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."  42 Pa. C.S.A. § 8541.  A local agency will be liable for an injury caused by it or its employees only if: (1) the injurious conduct would have given rise to liability under common or statutory law but for governmental immunity; and (2) the injury was caused by the negligent acts of the local agency or of an employee acting within the scope of his or her office or duties with respect to certain specific categories.  *Id.* § 8542.  These categories are the operation of motor vehicles; the care, custody and control of real property, personal property, and animals; sexual abuse; and the maintenance of utility service facilities, streets, trees, street lighting, traffic controls, and sidewalks. *Id.* § 8542(b).  "Negligent acts" for which a local agency may be held responsible do not include acts by an employee that constitute a "crime, actual fraud, actual malice, or willful misconduct"; only

the offending employees themselves may be held liable for such conduct. *Id.* §§ 8542(a)(2); 8550.

It is well-established that the City of Philadelphia is a "local agency" within the meaning of these provisions. *See Weinerman v.City of Philadelphia*, 785 F. Supp. 1174, 1178 (E.D. Pa. 1992) (citing *Walsh v. City of Philadelphia*, 585 A.2d 445, 450 (Pa. 1991)). To the extent Plaintiff is claiming "willful misconduct" such claims would be rooted in intentional tort, which would render the City immune. *Agresta v. City of Philadelphia*, 694 F. Supp. 117, 123 (E.D. Pa. 1988) (City immunized from intentional torts involving "actual malice" or "willful misconduct"); *see also Five Star Parking v. Philadelphia Parking Authority*, 662 F. Supp. 1053 (E.D. Pa. 1986). For Plaintiff's claims that are based upon negligence, none fall within the specific, limited categories of negligent acts for which the City may be held liable under the Tort Claims Act as set forth in the statute. *See also Moser v. Bascelli*, 865 F. Supp. 249, 253 (E.D. Pa. 1994) (dismissing plaintiff's claim for negligent infliction of emotional distress because it is not one of the exceptions to the Tort Claims Act); *Burns v. Blair Cty.*, 112 A.3d 690, 696 (Pa. Commw. Ct. 2015) (allegations of inadequate security and negligent supervision brought by an attorney who was attacked in court did not satisfy the real property exception to the Tort Claims Act as the injury was not "caused by a defect in the . . . property."); *Mascaro v. Youth Study Ctr.*, 523 A.2d 1118, 1124 (1987) (finding the City cannot be liable for the criminal act of a third party). Accordingly, Plaintiff's state law claims against the City of Philadelphia must be dismissed as barred by the City's immunity under Section 8541.

The Tort Claims Act also bars claims against municipal employees unless his or her conduct constitutes a "crime, actual fraud, actual malice or willful misconduct." 42 Pa.C.S. § 8550. Pennsylvania courts have defined "willful conduct" as that which either the actor desires to

bring about or is aware that the alleged harm is substantially certain to follow. *See Bright v. Westmoreland County*, 443 F. 3d 276, 287 (3d Cir. 2006) (quoting *Robbins v. Cumberland County Children and Youth Services*, 802 A.2d 1239, 1252-53 (Pa. Cmwlth. 2002)); *Evans v. Philadelphia Transportation Co.*, 212 A.2d 440 (Pa. 1965). After viewing the facts in light most favorable to the Plaintiff, there is no evidence in the record that Defendant Cheriyan desired to bring about or was aware that it was substantially certain that Defendant Ferebee would assault Plaintiff. Accordingly, Defendant Cheriyan is also immune from Plaintiff's state law claims.

### 5. Plaintiff's Claim under Pennsylvania's Constitution

Plaintiff also seeks damages invoking Article I Section 1 of the Pennsylvania Constitution which sets forth the "inherent rights of mankind" in language essentially unchanged from that of the Declaration of Rights (Article I) of Pennsylvania's 1776 State Constitution. That Section provides:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

There is no private cause of action for money damages for an alleged violation of the Pennsylvania Constitution. *See Jones v. City of Philadelphi*a, 890 A.2d 1188, 1216 (Pa. Commw. Ct. 2006) (holding that there is no right to monetary damages for an alleged violation of the Pennsylvania Constitution); *R.H.S. v. Allegheny County Dep't of Human Servs., Office of Mental Health*, 936 A.2d 1218, 1226 (Pa. Commw. Ct. 2007) (dismissing claim for monetary damages based on Pennsylvania Constitution); *Balletta v. Spadoni*, 47 A.3d 183, 190 (Pa. Commw. Ct. 2012) (finding no cognizable claim for state constitutional violations). Further, there is simply no evidence to support a claim that Plaintiff's rights afforded by Article I, Section 1 of the Pennsylvania Constitution have been violated.

**IV.      CONCLUSION**

For the reasons discussed above, the Court will grant Defendants' Motion for Summary

Judgment.  An appropriate Order will follow.

                                        **BY THE COURT:**

                                        /s/ Hon. Kelley B. Hodge

                                        _____
                                            **HODGE, KELLEY B., J.**